

# Missouri Court of Appeals
## Southern District
### Division Two

CHARLES LAUB, )
)
    Movant-Appellant, )
)
vs. ) No. SD33759
)
STATE OF MISSOURI, ) Filed December 22, 2015
)
    Respondent-Respondent. )

### APPEAL FROM THE CIRCUIT COURT OF CEDAR COUNTY

Honorable James R. Bickel, Circuit Judge

AFFIRMED

Charles Laub ("Movant") appeals the denial, without an evidentiary hearing, of his Rule 29.15 post-conviction relief motion alleging ineffective assistance of counsel.[1]  In his sole point on appeal, Movant claims that the motion court clearly erred in denying him an evidentiary hearing on his claim that trial counsel failed to present Movant's requested impeachment evidence against two State's witnesses.  Finding no merit in Movant's claim, we affirm.

---

[1] All rule references are to Missouri Court Rules (2015).

## Factual and Procedural Background[2]

At the time of the events leading to his conviction, Movant had been in an intimate relationship with Victim for just over nine years. Victim's sister ("Sister") was also a part of the relationship; the two women had participated in a religious ceremony of marriage with Movant at the same time, and Victim regarded both Sister and herself as being "married" to Movant. On February 21, 2011, Victim and Movant returned home after visiting Victim's family. Movant questioned Victim about whether she had spoken with her father outside of Movant's presence. Sister arrived at the home, and Movant became "upset about what [the women] were telling him." Movant yelled at Victim, "put his hat in [her] face and hit [her] in the face with it[.]" Movant then picked Victim up by her arms, pushed her, and tried to kick her, "barely" hitting her buttocks "with his toe."

Later that night, Movant went to bed with Victim and told her that he "wanted to have sex." Victim told him that she did not want to have sex. Although she resisted him, Movant undressed Victim and used his hands and feet to pull her legs apart. Victim told Movant, "No." Victim continued to resist, and Movant was unable to penetrate Victim's vagina with his penis. Victim "received bruising" from Movant's efforts, and the bruises were still apparent when she reported the incident to the authorities seven days later on February 28, 2011. Two photographs of Victim's bruises were admitted into evidence at trial. Victim and Sister were taken to a WIC[3] appointment by their parents on February 28, 2011. After that appointment, "[they] decided that [Victim and Sister] would go to the police department and ask for help to leave, so that [they] could leave safely."

---

[2] In an order and unpublished statement issued February 13, 2014, this court previously affirmed Movant's convictions of attempted forcible rape and third-degree domestic assault in appeal number SD32648. Portions of that memorandum appear in these facts without further attribution.

[3] "WIC" is a common reference for the Women, Infant and Children's Office. *See **In re C.A.L.**,* 228 S.W.3d 66, 69 (Mo.App. 2007).

Victim and Sister proceeded to the Cedar County Sheriff's Office. Once there, in addition to Victim's complaints, Sister alleged that Movant had sex with her without her consent on August 25, 2009, while her three-day-old child was in the room. Sister stated that Movant "got up on top of me" and "was holding my arms down when he forced it in." Sister's vagina was stitched after the child's birth, and Sister stated Movant's assault "felt like I could literally feel my stitches pulling apart and my skin pulling apart."

Movant was charged with the attempted forcible rape of Victim, *see* sections 566.030, RSMo Cum.Supp. 2009, and 564.011, RSMo 2000; third-degree domestic assault of Victim, *see* section 565.074, RSMo 2000; and sexual assault of Sister, *see* section 566.040, RSMo 2000. Movant was represented by Nicholas L. Swischer at trial. A jury found Movant guilty of the charges against Victim but acquitted on the charge against Sister. He was sentenced to serve seven years' imprisonment for the attempted forcible rape conviction and fined $500 for the domestic assault conviction. On direct appeal, this court affirmed Movant's convictions and sentence on February 13, 2014, by an order and unpublished statement in **State v. Laub**, appeal number SD32648. Mandate issued March 3, 2014.

Movant timely filed a *pro se* Rule 29.15 motion for post-conviction relief on April 1, 2014. In a letter dated April 11, 2014, the trial court notified the public defender's office that Movant had filed a *pro se* motion. The letter stated:

> Per our prior efforts to assist the Public Defender's Office in managing case overload, this is notice that [Movant] has filed a pro se motion under Rule [29.15], copy is included. I am not appointing the Public Defender's office at this time, but ask that you assign an attorney as soon as possible, in order to file any amended motion.

A docket entry, dated April 18, 2014, states: "Judge's Docket Entry. Movant allowed to proceed in forma pauperis. PD office notified and will enter appearance when workload permits."

3

On June 25, 2014, Arthur E. Allen entered his appearance on behalf of Movant and moved for an extension of time in which to file an amended motion. On that same date, the motion court granted "additional time to file amended motion pursuant to Rule 29.15[.]" An amended Rule 29.15 motion was filed September 23, 2014. No evidentiary hearing was held, and on January 14, 2015, the motion court entered its order denying Movant's motion. Movant timely filed his notice of appeal.

## Standard of Review

This court's review of the denial of a Rule 29.15 motion for post-conviction relief is limited to determining whether the motion court's findings of fact and conclusions of law are clearly erroneous. Rule 29.15(k); *Williams v. State*, 168 S.W.3d 433, 439 (Mo. banc 2005). Such findings and conclusions are considered clearly erroneous only if a full review of the record leaves us with "a definite and firm impression that a mistake has been made." *Zink v. State*, 278 S.W.3d 170, 175 (Mo. banc 2009) (internal quotations omitted). It is incumbent upon the movant in a post-conviction motion to prove his or her claims for relief by a preponderance of the evidence, Rule 29.15(i), and this court presumes that the motion court's findings and conclusions are correct. *McLaughlin v. State*, 378 S.W.3d 328, 336-37 (Mo. banc 2012). We will defer to the motion court's determinations of credibility, and the motion court is free to believe all, part, or none of the witnesses' testimony. *Zink*, 278 S.W.3d at 192.

## Discussion

In order to prevail on a post-conviction motion alleging ineffective assistance of counsel, a movant must overcome a strong presumption of competence and demonstrate, by a preponderance of the evidence, that (1) counsel did not exercise the customary skill and diligence that a reasonably competent attorney would have exercised under the same or similar circumstances, and (2) counsel's failure to exercise such skill and diligence prejudiced the

4

movant in some way.  *Strickland v. Washington*, 466 U.S. 668, 687, 689, 104 S.Ct. 2053, 80 L.Ed.2d 674 (1984); *Anderson v. State*, 196 S.W.3d 28, 33 (Mo. banc 2006).  To satisfy the performance prong, a movant "must overcome the presumptions that any challenged action was sound trial strategy and that counsel rendered adequate assistance and made all significant decisions in the exercise of professional judgment." *State v. Simmons*, 955 S.W.2d 729, 746 (Mo. banc 1997).  In order to demonstrate the requisite prejudice, a movant must show that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.  *Strickland* defines "a reasonable probability" as "a probability sufficient to undermine confidence in the outcome." *Id.* In reviewing such claims, we are not required to examine both prongs; if a movant fails to satisfy the performance prong, we need not consider the prejudice prong, and vice versa. *Strickland*, 466 U.S. at 697; *State v. Sanders*, 738 S.W.2d 856, 857 (Mo. banc 1987).

"An evidentiary hearing on a motion for post-conviction relief is not required where 'the motion and the files and records of the case conclusively show that movant is entitled to no relief.'" *Morrow v. State*, 21 S.W.3d 819, 822 (Mo. banc 2000) (quoting Rule 29.15(h)).  In reaching this determination, "courts will not draw factual inferences or implications in a Rule 29.15 motion from bare conclusions or from a prayer for relief." *Morrow*, 21 S.W.3d at 822 (citing *White v. State*, 939 S.W.2d 887, 893 (Mo. banc 1997)).  A movant is entitled to an evidentiary hearing on his Rule 29.15 motion only if his motion meets three requirements:  "(1) the motion must allege facts, not conclusions, warranting relief; (2) the facts alleged must raise matters not refuted by the files and records in the case; and (3) the matter of which movant complains must have resulted in prejudice." *Morrow*, 21 S.W.3d at 823 (citing *State v. Brooks*, 960 S.W.2d 479, 497 (Mo. banc 1997)).

5

### *Amended Motion was Timely Filed*

The State initially contends in its responding brief that Movant's amended motion was untimely filed and absent any indication in the record that the motion court conducted an independent inquiry into "whether the untimely filing of [Movant's] amended motion was due to abandonment by post-conviction counsel[,]" remand is required. Movant did not file a reply brief to address the State's contention.

Nevertheless, under ***Moore v. State***, 458 S.W.3d 822 (Mo. banc 2015), we are compelled to *sua sponte* examine the record to determine whether an amended motion for post-conviction relief was timely filed. Rule 29.15(g) provides, in part:

> If an appeal of the judgment sought to be vacated, set aside, or corrected is taken, the amended motion shall be filed within sixty days of the earlier of: (1) the date both the mandate of the appellate court is issued and counsel is appointed or (2) the date both the mandate of the appellate court is issued and an entry of appearance is filed by any counsel that is not appointed but enters an appearance on behalf of movant.

*See also* ***Schneider v. State***, 787 S.W.2d 718, 720 (Mo. banc 1990). Here, the latter provision applies because the record reveals that there was no appointment of counsel for Movant by the motion court before attorney Allen entered his appearance on Movant's behalf on June 25, 2014.

Mandate in Movant's direct appeal issued March 3, 2014. Movant filed a timely *pro se* motion for post-conviction relief on April 1, 2014. *See* Rule 29.15(b) (motion shall be filed within ninety days after the date the mandate of the appellate court is issued affirming such judgment or sentence). By letter dated April 11, 2014, the motion court notified the public defender's office that Movant had filed a *pro se* motion and advised, "I am *not* appointing the Public Defender's office at this time, but ask that you assign an attorney as soon as possible, in order to file any amended motion." (Emphasis added). On April 18, 2014, the motion court made a docket entry that "PD office notified and will enter appearance when workload permits."

6

Following the motion court's initials on this docket entry, the clerk made a parenthetical notation that "(copy of docket entry faxed to PD office)."

In its respondent's brief, without citation to any supporting legal authority, the State contended that the April 11 letter "sent by the motion court to the Public Defender's Office was a de facto appointment [that] triggered the time when the amended motion was due[.]" It was not. The motion court's April 11 letter, a copy of which was sent to the State, expressly stated that the motion court did not appoint the public defender to represent Movant. Rule 29.15(e) provides that "[w]hen an indigent movant files a pro se motion, the court shall cause counsel to be appointed for the movant[,]" but it does not provide any specific time within which that must be done. Rule 29.15(e).

After this case was submitted, the State, in support of its contention, directed us to *State v. Creighton*, ___ S.W.3d ___, No. ED102030, 2015 WL 9240967 (Mo.App. Dec. 15, 2015), where the eastern district of this court recently decided that the motion court's notification of the filing of a *pro se* motion directed to a public defender operated as an appointment of counsel, thus triggering the time limits for the filing of an amended motion under Rule 29.15(g). That notification stated, apparently in its entirety: "The Court hereby notifies Scott Thompson appellate District Defender that Movant Rodney Creighton has filed a post-conviction motion. The motion is accompanied by an affidavit of indigency. So ordered, Judge Elizabeth B. Hogan." *Id.* at 2. This unqualified notification, however, distinguishes *Creighton* and makes it inapposite here where the motion court expressly qualified its notification by stating that it was "*not* appointing the Public Defender's office at this time."

While, as a general proposition, it may be considered a best practice for the motion court to routinely appoint counsel immediately after an indigent movant files a *pro se* motion, here the

motion court articulated in its April 11 letter a reasonable basis to temporarily delay making such an appointment. To now construe that well-reasoned, expressed delay in making an appointment as an implicit appointment of the Public Defender would be disingenuously unfair to Movant and to the Public Defender.

Attorney Allen entered his appearance on June 25, 2014, and requested additional time to file an amended motion,[4] which the motion court granted on that date. Movant's amended motion was filed September 23, 2014.[5]

The Rule 29.15(g) initial sixty-day period in which to file an amended motion began to run on the date post-conviction counsel entered an appearance on June 25, 2014. Therefore, the amended motion was initially due on or before August 24, 2014. Rule 29.15(g) further provides, however, that "[t]he court may extend the time for filing the amended motion for one additional period not to exceed thirty days." The motion court's June 25, 2014, order granting an additional thirty days beyond the initial sixty-day period extended the time within which an amended motion was due until on or before September 23, 2014. Therefore, Movant's amended motion filed on September 23, 2014, was timely.

### Denial of Motion is not Clearly Erroneous

Turning to the merits of Movant's claim, Movant contends that the motion court clearly erred in denying, without an evidentiary hearing, his claim that his trial counsel was ineffective for failing to present evidence that supported Movant's theory of an additional reason why Victim was motivated to falsely accuse him.

Movant argued to the motion court and now argues on appeal that:

---

[4] Based upon its erroneous assumption that the April 18 docket entry and notice to the Public Defender was a *de facto* appointment of the Public Defender to represent Movant, the State contends that "[t]he request for the additional [thirty] days was a nullity as it was filed after the amended motion was due."

[5] On October 23, 2014, the State filed an answer to Movant's amended motion, however, it raised no issue related to the timeliness of the filing of the amended motion.

[Movant] informed [counsel] of [Sister's] use of AJAX dishwashing soap to wash out the mouth of one of their children. The child was experiencing seizures and [Sister] wanted the child's tonsils removed as a cure for the seizures. A doctor found nothing wrong with the child's tonsils, and further indicated that he would not perform surgery on the child while the seizures persisted.

According to the amended motion, [Movant] refused to provide consent for a tonsillectomy. [Movant] later learned that the child's seizures were likely caused by the use of the dishwashing soap to wash the child's mouth.

[Movant's] motion alleged that he informed [counsel] of these facts. [Movant] requested [counsel] to "present evidence of the dispute between [Movant] and [Sister] about the tonsillectomy issue and the seizures to show that the dispute about [the child's] medical treatment was the key factor in causing [Sister] and [Victim] to make false allegations against [Movant] in order to get away from [Movant] so that [Sister] could have [the child's] tonsils removed without having to get [Movant's] consent to do so."

(Internal citations to record omitted).

The motion court[6] rejected Movant's claim, finding that "[a]fter reviewing Movant's Amended Motion pursuant to Rule 29.15 and the files and records in the case, the Court determines that all matters conclusively show the Movant is not entitled to relief. Therefore no hearing is warranted." The motion court further stated that the record did not support an ineffective assistance of counsel claim and no prejudice resulted from not presenting the testimony advanced by Movant.

Counsel's decision as to the extent of the impeachment of a witness is a matter of trial strategy. *White v. State*, 939 S.W.2d 887, 897 (Mo. banc 1997). "In virtually every case, the extent of cross-examination must be left to the judgment of counsel." *Id.* Moreover, trial counsel's failure to impeach a witness does not alone constitute ineffective assistance of counsel. *Id.* To establish ineffective assistance for counsel's failure to impeach a witness, the movant must show that the impeachment of the witness would have provided the Movant a viable

---

[6] Here, the motion court was the same court that presided over the jury trial below. As such, the motion court was well aware of and could take judicial notice of its own files from Movant's criminal trial. *See, e.g.*, *C.A.W. v. Weston*, 58 S.W.3d 909, 914 (Mo.App. 2001); *State v. Dillon*, 41 S.W.3d 479, 482-83 (Mo.App. 2000); *Schrader v. State*, 561 S.W.2d 734, 735 (Mo.App. 1978).

9

defense or otherwise changed the outcome of the trial. ***Black v. State***, 151 S.W.3d 49, 55 (Mo. banc 2004); ***Roberts v. State***, 232 S.W.3d 581, 585 (Mo.App. 2007). Impeachment testimony that negates an element of the crime for which the movant was convicted provides a viable defense. ***Whited v. State***, 196 S.W.3d 79, 82 (Mo.App. 2006).

Here, trial counsel pursued the theory at trial that a religious disagreement motivated the sisters to fabricate their stories against Movant. Movant now argues trial counsel should have further developed the fabrication theory by exposing an alleged disagreement between Movant and Sister over a child's medical procedure as an additional potential motive for the sisters to lie. Movant contends trial counsel should have elicited this testimony through cross-examination of Sister and Victim, and direct examination of Movant, Melinda Compton, and Rhonda Knight.

Movant fails, however, to allege facts in his motion or in his brief on appeal supporting and explaining how such testimony would have presented him with a viable defense to the charge of attempted forcible rape or third-degree domestic assault against Victim. *See **Londagin v. State***, 141 S.W.3d 114, 119 (Mo.App. 2004) (where movant fails to explain how that testimony would have presented him with a viable defense to the charge, counsel was not ineffective for failing to present testimony that would merely impeach a witness for the State); *see also* ***State v. Mills***, 872 S.W.2d 875, 881 (Mo.App. 1994); ***Webster v. State***, 837 S.W.2d 585, 588 (Mo.App. 1992); ***Lane v. State***, 778 S.W.2d 769, 771 (Mo.App. 1989).

Similarly, Movant has failed to demonstrate how trial counsel's omission of this evidence would have affected the outcome of his trial—the prejudice prong of ***Strickland***. For the reasons that follow from our full review of the record, we are not left with a definite and firm impression that the motion court was mistaken in finding that any further impeachment of Sister

10

or Victim's credibility as to the alleged medical dispute between Movant and Sister did not undermine its confidence in the outcome of Movant's trial.

At trial, the State's case consisted of testimony from Sister, Victim, and Lieutenant Kevin Lowe of the Cedar County Sheriff's Office, respectively. Sister testified that Movant had sexually assaulted her on August 25, 2009. Sister had stitches in her vagina from recently giving birth and claimed Movant ripped those stitches while forcing her to have sex without her consent. On cross-examination, trial counsel successfully impeached her testimony that Movant sexually assaulted her, as evidenced by Movant's acquittal on the charge. Although Sister clearly had the ability to report the incident, trial counsel elicited that she did not report it to anyone until February 28, 2011, roughly eighteen months after the incident. Trial counsel also elicited that Sister did not report the alleged sexual assault to her midwife or her doctor, whom she saw roughly two weeks after the incident, even though her testimony was that she felt her stitches rip during the sexual assault and was bleeding. Sister also admitted she did not inform Victim of the incident. Finally, trial counsel elicited and highlighted that Sister had both a home phone and a cell phone over that time period with which she could have called the sheriff's office.

The State's second witness, Victim, testified that on February 21, 2011, Victim and Sister, Victim's five children, Sister's three children, and Movant went to see Victim's parents. After returning home, Movant became agitated and asked whether Victim had talked with her father alone. "[H]e was upset about what we were telling him. And he, he yelled at me and put his hat in my face and hit me in the face with it and I took it from him and I threw it in his face." Victim further testified that "[h]e picked me up by my arms, turned me around and pushed me on the back and tried to kick me and barely got me with his toe" on the buttocks. Movant then

11

made sexual advances. Victim responded that she "didn't want to." Movant continued, forced himself on Victim, undressed her, and pulled her legs apart with his hands and feet, even though she said "no" and "continued to ask him to stop." Movant was not able to insert his penis into her vagina.

On cross-examination, trial counsel impeached Victim's testimony using several techniques, including confronting her with her prior inconsistent statements and pointing out multiple inconsistencies in her story. Trial counsel elicited from Victim that Victim had consensual sex with Movant on the morning of February 21; Victim did not call law enforcement the night of February 21 or morning of February 22; Victim had consensual sex with Movant the morning of February 28 at 9 a.m., but reported later that same day that Movant had attempted to rape her; Victim did not inform the sheriff's office of having consensual sex with Movant on February 21 or February 28, or on another occasion between those two days. Trial counsel also elicited from Victim that she and Movant were having religious disagreements and Movant had asked her "to go to a bishops meeting" to try and settle the differences. Under trial counsel's further questioning, Victim admitted she told Movant before February 28 that she was considering leaving him, but nevertheless had consensual sex with him after that.

Trial counsel further called Victim's testimony into question by attempting to establish that her story was implausible in light of the length of the incident and the presence of so many children in the home:

> Q. And no children were awakened or came around when you say you, at 10:00 o'clock at night, on February 21st, refused to have sex with [Movant]. Is that true?
>
> A. True.
>
> Q. How long did that go on February 21st?
>
> A. Most of the night, into the early morning.

12

Q. So, how long is that? You went to bed at 10:00 o'clock, what hour in the morning did it stop at?

A. After 4:00 o'clock, I think.

Q. So, it went on for six hours?

A. Yep.

Q. And he tried to have sex with you for six hours and you stopped him?

A. Yes.

Q. And none of the kids got woke up?

A. No.

During the defense's case, trial counsel called Melinda Compton to testify. Compton was another of Movant's wives. She and Movant had been together twenty-three years and had four children. Victim and Sister had joined their family in 2001. In reference to Compton's talks with Sister about the alleged sexual assault on August 25, 2009, trial counsel asked:

Q. What did [Sister] say about August 25th, three days after [child] was born?

A. She said that she woke up when it was too late.

Q. She never did describe a long dispute?

A. No.

Q. She didn't talk about saying "no"?

A. No.

Q. Just she woke up when it was too late?

A. Yes.

Compton had gone to the doctor's office with Sister just after August 25, 2009. Compton stated that she would have left the doctor's office if Sister asked, but Sister never asked, and Sister never told her or the doctor about any bleeding, or that her stitches had pulled apart. Later,

13

in an attempt to challenge Victim's motive in testifying, trial counsel asked Compton the following:

Q. What did you hear on February 22nd?

A. I heard [Sister] say that if [Victim] left, she was going too.

Q. Did they tell you what they were talking about?

A. Umm, had something to do with -- yeah, [Sister] said it was [Movant] had told his parents something about their religious differences that he and [Victim] were having.

Q. Did that upset [Victim] that Mr. Laub had gone to the bishop, his dad?

A. Yes.

Trial counsel then called Movant to testify in his own defense. In a continued attempt to discredit Victim's testimony, counsel elicited from Movant that several light-sleeping children slept within twenty feet of his bedroom, and they would likely have been awakened by the struggle described by Victim. Finally, trial counsel inquired of Movant as to a potential motive for Sister and Victim to lie about the charges against him as follows:

Q. Had there been any discussion about troubles between you and those two wives and them wanting to leave at that time [February 22, 2011]?

A. There was.

Q. And what were they over?

A. Religious indifferences [sic].

Q. And what had they found out with regard to your talking to the bishop, who is your father, Darrell Laub, about religious differences that [Victim] had?

A. I told them that I would talk to my father, who was the bishop, about having a bishops court to try to settle our religious differences.

Q. And bishops court is simply marriage counseling?

A. Yes.

Q. And with regard to that, what was [Victim] upset about?

14

A. She was upset that I had talked to my father about that.

Q. Did she agree to do the counseling?

A. Yes, she did.

Q. Did you ever get to do the counseling?

A. No, we wasn't able to get a time arranged before they left.

Q. During this time period, did [Compton] come over to that house?

A. Yes, she did.

Q. When [Compton] came over to the house, was [Victim] saying anything?

A. Yes.

Q. What was [Sister] saying?

A. [Sister] said if [Victim] leaves, that she was going to leave too.

Trial counsel made substantial efforts to attack Sister's and Victim's credibility and show the jury their potential motives in testifying against Movant. In addition, counsel offered Movant the chance to explain Victim and Sister's motive to fabricate the charges against him. Movant told the jury that religious differences, rather than a disagreement with Sister over a child's medical treatment, motivated their attempt to get away from Movant. Trial counsel's efforts were successful in discrediting Sister as to the charge involving her. Movant has completely failed to demonstrate how offering an additional motive for Sister's already discredited testimony would have resulted in a different outcome on the charges involving Victim. Movant's point is denied.

## Decision

After reviewing the record, we do not have a definite and firm impression that a mistake was made. Therefore, the findings and conclusions of the motion court are not clearly erroneous.

15

Accordingly, the motion court's order denying Movant's Rule 29.15 motion for post-conviction relief is affirmed.

GARY W. LYNCH, J. – Opinion author

DON E. BURRELL, P.J. – concurs

NANCY STEFFEN RAHMEYER, J. -- concurs